UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRACY SCHOENADEL,

                Plaintiff,

-against-

YOUGOV AMERICA INC.,

                Defendant.

22-cv-10236 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

    Tracy Schoenadel was an executive at YouGov America Inc. She sued YouGov after she resigned, alleging that because of her gender, the company passed her over for a promotion, denied her compensation, and diminished her responsibilities. Schoenadel says that YouGov's misconduct worsened after she complained about bias, forcing her to resign. Schoenadel brings claims for gender discrimination and retaliation under federal, state, and local law, as well as a claim under the New York Labor Law for an unpaid bonus. YouGov moves for summary judgment and to strike portions of Schoenadel's evidence. For the following reasons, the motions are DENIED.

## BACKGROUND

    YouGov America Inc. is a data-and-analytics company with six locations across the United States. Dkt. 99 ¶¶ 1, 3. Its parent is YouGov PLC, a UK-based company. *Id.* ¶ 2. Schoenadel joined YouGov in 2015 in a sports-focused role, reporting directly to Frank Saez. *Id.* ¶¶ 8, 9. In 2020, she was named "Global Head of New Business Sales" by Sundip Chahal, the PLC's chief operating officer, and was responsible for YouGov's new-business sales in both the US and UK. *Id.* ¶¶ 36, 38; *see also* Dkt. 75-40 at 20. Schoenadel also retained her sports role. Dkt. 99 ¶ 36.

    As Global Head of New Business Sales, Schoenadel was part of YouGov's senior leadership. *Id.* ¶ 39. Not only did her salary increase, but she also became eligible for "two separate incentive compensation structures." *Id.* ¶ 43. The parties disagree over the specifics of these incentives. YouGov says Schoenadel was entitled to "a discretionary bonus and potential commission bonus for her Sports role and potential commission for her New Business role." Dkt. 77 ¶ 7. Schoenadel says that she was entitled to a nondiscretionary sports bonus equal to 2% of the overall sports profit-and-loss margin. Dkt. 94 ¶ 94. For the new-business position, the parties agree that Schoenadel's compensation structure allowed her to receive a bonus equaling one percent of US new-business sales if her department hit seventy percent of its quarterly sales target, but they disagree over whether Schoenadel became merely "eligible" for these commissions or whether YouGov was required to pay them. *See id.* ¶ 13; Dkt. 77 ¶ 8.

In July 2020, Schoenadel became eligible for a third incentive: the PLC's Long Term Incentive Plan. Dkt. 99 ¶ 49. LTIP was "a share-based incentive arrangement under which the Remuneration Committee of PLC [could] approve the grant of share-based awards to selected key employees." *Id.* ¶ 50. The program covered a four-year period, from 2019 through October 2023, and eligible employees had three award opportunities during that time. *Id.* LTIP awards were based on performance, and the PLC's board retained discretion to reduce or cancel an award. *See id.* ¶¶ 51, 54.

In her new-business role, Schoenadel was responsible for forecasting new-business sales for 2021. *Id.* ¶ 75. Halfway through the fiscal year, YouGov leadership met to discuss whether any reforecasting was necessary. *Id.* ¶ 107. YouGov says that despite a shortfall in the first half of the year, Schoenadel assured leadership that the unit would likely hit its numbers. *Id.* ¶¶ 106, 111.

That spring, YouGov reorganized. Dkt. 77 ¶ 17. In the shake-up, Schoenadel told Saez that she wanted to be named either the global "Deputy Chief Revenue Officer" or "Chief Executive Officer of the Americas," which Saez relayed to Chahal. Dkt. 94 ¶ 58; Dkt. 90-50. Steven Shakespeare, the PLC's CEO, traveled to the US, where he met individually with Scott Horowitz (who at the time reported to Schoenadel), Ray Martin (who was then chief client officer), and Schoenadel to discuss their future roles. *See* Dkt. 94 ¶¶ 49–50; Dkt. 92 ¶ 66; Dkt. 75-38 at 161–63; *see also* Dkt. 99 ¶¶ 41, 48. Schoenadel says that he spent thirty minutes with her and a day or two with Horowitz and Martin. *See* Dkt. 94 ¶ 50; Dkt. 92 ¶ 66; Dkt. 75-38 at 161–63. She also says that Shakespeare promised her during their meeting that she would have global client servicing responsibilities. Dkt. 94 ¶ 50.

Shortly after, YouGov appointed Schoenadel chief customer officer (CCO) for YouGov. *Id.* ¶ 53. Meanwhile, Martin got the position Schoenadel wanted—CEO of the Americas—and Horowitz was appointed "Chief Resource Officer of the Americas." Dkt. 99 ¶ 167; Dkt. 92 ¶¶ 66, 68. Chahal (COO), Alexander McIntosh (CFO), and Shakespeare (CEO) were the decisionmakers on the CEO of the Americas role. Dkt. 99 ¶ 168.

According to Schoenadel, the responsibilities that Shakespeare promised her when they met were "quickly taken away" and given to men. Dkt. 94 ¶ 178. On July 11, 2021, Schoenadel emailed Saez and Horowitz, complaining that the "responsibilities [she] discussed with [Shakespeare] for the CCO position seem[ed] to be diminishing, assigned to others, placing [Schoenadel] in a probable position of irrelevance," and that it was "generating an uneasy feeling for [Schoenadel], a sense of being misguided, [and] perhaps some bias." Dkt. 98-126. Saez forwarded this complaint to Chahal. *Id.*

In the summer of 2021, Schoenadel agreed—on YouGov's behalf—to an NDA with a potential client. Dkt. 99 ¶ 269. She didn't get the legal department's sign-off first, which YouGov says violated its policies. *Id.*; *see also* Dkt. 77 ¶ 40. For her part, Schoenadel says that she attended a training where she was instructed that "employees executing NDAs should use their discretion when considering having it reviewed by Legal." Dkt. 94 ¶ 132.

2

Following the close of the fiscal year in August 2021, YouGov leadership held a meeting with US management to review that year's sales numbers. Dkt. 99 ¶¶ 207, 210. YouGov says New Business's sales for the year fell below the company's target. Dkt. 77 ¶ 27. Schoenadel says that she was singled out for criticism during this meeting and that McIntosh (the CFO) told everyone on the call that she had cost him his bonus. Dkt. 75-37 at 206.

Various YouGov leaders, including Shakespeare, McIntosh, Chahal, and Saez, held follow-up meetings with Schoenadel where they addressed the shortfall and other performance concerns. Dkt. 99 ¶¶ 224–25. For example, they critiqued the "timing, size and scale" of a July 2021 new-business sales team meeting held in New York City as "tone deaf." Id. ¶ 222. (Schoenadel says she wasn't responsible for organizing this meeting. Dkt. 94 ¶ 103.) They also raised concerns to Schoenadel about her compliance with YouGov's policies, and specifically her execution of the NDA without legal review. Dkt. 99 ¶ 228. Schoenadel says that Saez told her to "put [her] head down and continue to work," and that YouGov was a "man's world." Dkt. 94 ¶ 213.

Schoenadel says that she was also denied her sports bonus because of the new-business budget shortfall. Id. ¶ 98. According to Schoenadel, she "had an agreement with Saez, to whom [she] reported, that [she] would receive an annual Sports bonus equal to 2% of the Sports profit and loss margin." Id. ¶ 94. (As evidence of this agreement, she points to an email between her and Saez in which she memorialized this understanding. Dkt. 98-75.) Saez had approved the bonus for previous years, but when he told her she was not going to receive it that year, he said it was because McIntosh "hated [her] guts." Dkt. 94 ¶¶ 95, 216.

By September 2021, Schoenadel and Horowitz (the CRO of the Americas) were talking about leaving YouGov. Dkt. 99 ¶ 357. On October 2, 2021, Schoenadel texted Horowitz that she had "made the decision . . . to resign after [she] g[o]t [her] bonus." Id. ¶ 358. Around this time, Horowitz and Schoenadel were in touch with two of YouGov's competitors, Playfly and SponsorUnited. Id. ¶¶ 359, 369.

In November 2021, Schoenadel executed an addendum to an agreement with one of YouGov's clients, extending the duration of YouGov's services to that company. Id. ¶ 274. Again, Schoenadel didn't run this by legal before signing it, and again, the parties dispute whether legal review was required by YouGov's policies. Id. ¶ 277; see also Dkt. 94 ¶ 132. YouGov says that the agreement "has resulted in serious financial repercussions for YouGov, costing YouGov millions of dollars." Dkt. 80 ¶ 5. (It also claims that it couldn't calculate the estimated financial impact of the deal until July 29, 2022, after Schoenadel left YouGov. Id. ¶ 6.)

On November 11, 2021, after Schoenadel faced criticism about the agreement, she emailed Saez, copying HR, to address "some recent questions around [her] day-to-day responsibilities at YouGov in hopes it can be addressed and fixed at its earliest convenience." Dkt. 75-1. Schoenadel wrote that "no matter how much [she tried] to adapt in the best interest of the company, unwarranted perceptions of [her were] not going away." Id. Saez forwarded this email to Chahal and Shakespeare. Id. In a video call the following day, "Saez told [Schoenadel] again that McIntosh hated [her] guts and was doing everything he could to get [her] fired." Dkt. 94 ¶ 219.

On November 12, 2021, the Remuneration Committee decided LTIP awards. Dkt. 99 ¶ 314. For each eligible individual, their manager submitted a recommendation as to how much of their LTIP target they should receive, and then Shakespeare, McIntosh, and Chahal submitted a final recommendation to the committee. *Id.* ¶¶ 315–16. YouGov ultimately granted Schoenadel half of the LTIP award she was eligible for. *Id.* ¶ 321.

On December 23, 2021, Schoenadel submitted an internal grievance to HR alleging discrimination based on incidents from summer through December 2021. Dkt. 75-18. After Schoenadel informed YouGov that she retained counsel and planned to pursue an external charge of discrimination, YouGov retained outside counsel to investigate her allegations. Dkt. 99 ¶¶ 333–34.

The parties dispute what Schoenadel's relationship with YouGov leadership was like after she filed her complaint. Schoenadel says that she had weekly meetings with Horowitz, Martin, and Marijana Sarac (who was the Global Head of Finance for Data Products & Services) until "Martin started canceling the meetings after [Schoenadel] submitted [her] [g]rievance."[1] Dkt. 94 ¶ 160; *see also* Dkt. 99 ¶ 57. Meanwhile, Martin testified that he "barely had any meetings with [Schoenadel]" to begin with and "never had an independent weekly meeting" with her. Dkt. 75-38 at 282–83. Schoenadel also says that her exclusion from senior leadership meetings began in July 2021 and "escalated in late 2021 and early 2022."[2] Dkt. 94 ¶ 161.

On March 16, 2022, after what Schoenadel characterizes as months of being iced out, she resigned from YouGov. *Id.* ¶ 224. The HR investigation was still ongoing at the time of Schoenadel's resignation. Dkt. 99 ¶ 339. On July 18, 2022, YouGov informed Schoenadel that it had concluded its investigation and that it didn't substantiate Schoenadel's allegations of gender discrimination. *See* Dkt. 94 ¶ 157; Dkt. 90-20.

On December 2, 2022, Schoenadel filed suit against YouGov, alleging gender discrimination and retaliation under Title VII, the New York State Human Rights Law (NYSHRL), and the New York City Human Rights Law (NYCHRL). Dkt. 1 ¶¶ 69–92. In her amended complaint, she added

---

[1] YouGov says that this portion of Schoenadel's declaration contradicts her deposition testimony that she was "only not invited to leadership meetings in July 2021 regarding pricing workstreams and two similar meetings on the same topic after filing her [g]rievance." Dkt. 120 at 13. To the extent that YouGov challenges Schoenadel's suggestion that her exclusion worsened after she filed the grievance, the Court doesn't see a clear conflict between the deposition and her declaration. In her deposition, Schoenadel referenced two important "workstream meetings" that she was excluded from after she filed her grievance, as well as "similar" meetings she had been excluded from in July. Dkt. 75-37 at 349–50. But she also testified that Martin canceled their weekly meeting on January 5th, 2022, and "didn't really talk to [her] after [she] filed the grievance." *Id.* at 350. A reasonable juror could consider Martin's actions an escalation.

[2] YouGov also wants to strike this portion of Schoenadel's declaration on the ground that it is contradicted by Schoenadel's deposition testimony and that Schoenadel has no "personal knowledge" of whether her exclusion escalated. *See* Dkt. 120 at 13. The Court rejects these arguments. For the reasons explained in footnote 1, the Court doesn't see Schoenadel's deposition testimony as contradicting her declaration, and Schoenadel can testify as to her own exclusion.

4

a claim for unlawful wage deductions under the New York Labor Law (NYLL). Dkt. 20 ¶¶ 94–96. YouGov moves for summary judgment on all counts. Dkt. 66. It also moves to strike certain materials submitted by Schoenadel in response to its motion for summary judgment. Dkt. 119.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it could "affect the outcome." *Id.* The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear the burden of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

"'[A]n extra measure of caution is merited' before granting or affirming 'summary judgment in a discrimination action because direct evidence of discriminatory intent is rare.'" *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 228 (2d Cir. 2024) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001)). "Thus, the court must scrutinize affidavits and depositions carefully for circumstantial evidence that, if credited by the factfinder, could reasonably be interpreted as showing discrimination." *Id.*

## DISCUSSION

### I. The Motion to Strike Is Denied

YouGov moves to strike portions of seven different declarations, two exhibits, and a portion of Schoenadel's Rule 56.1 statement. *See* Dkt. 120 at 1. "Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, are conclusory or argumentative, or do not cite to supporting evidence." *Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002). The Court will not "scrutiniz[e] each line" of these materials in this opinion, *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 569 (E.D.N.Y. 1999), but it "has disregarded any inappropriate portions of [Schoenadel's] submissions, and its analysis relies upon admissible evidence." *Epstein*, 210 F. Supp. 2d at 314.

### II. The Title VII Discrimination Claim Survives

"To succeed on a Title VII disparate treatment claim, a plaintiff must prove 'discrimination either by direct evidence of intent to discriminate' or, more commonly, by 'indirectly showing circumstances giving rise to an inference of discrimination.'" *Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024) (quoting *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 270 (2d Cir. 2023)). "When only circumstantial evidence of discriminatory intent is available, courts use the *McDonnell Douglas* burden-shifting framework to assess whether the plaintiff has shown sufficient evidence of discrimination to survive summary judgment." *Id.* "A plaintiff's first step under *McDonnell Douglas* is to establish a prima facie case of discrimination by showing that '(1) she is a member

of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.'" *Id.* at 570 (quoting *Banks*, 81 F.4th at 270). "The burden at this stage 'is not onerous.'" *Id.* (quoting *Banks*, 81 F.4th at 270). "Once the plaintiff has established a prima facie case, the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its adverse action." *Id.* (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015)). "Upon that showing, the burden then shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination." *Id.*

YouGov says that Schoenadel can't make out a *prima facie* case of discrimination because she can't show that she suffered an adverse employment action. And even if Schoenadel could, YouGov says that she cannot prove that its reasons were pretextual. The Court addresses each argument in turn.

### A. Adverse Employment Action

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

When this motion was filed, the law in this circuit was that a plaintiff suffers discrimination in the "terms and conditions of [their] employment" if they endure a "materially adverse change." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). But the Supreme Court's recent decision in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) changed the landscape. *See Anderson v. Amazon.com*, 2024 WL 2801986, at *10 (S.D.N.Y. May 31, 2024). In *Muldrow*, the Court rejected the idea that harm must be "significant" to be actionable under Title VII. 601 U.S. at 353. The Court explained that imposing a heightened requirement, such as "significant," "material," or "serious," requires litigants to "make a showing that the statutory text does not require." *Id.* at 355–56. The decision explicitly "lowers the bar Title VII plaintiffs must meet." *Id.* at 356 n.2.

*Muldrow* undermines YouGov's position. Schoenadel says that "YouGov took multiple actions that a jury could find adverse," including denying Schoenadel her bonus and full LTIP award, denying her the promotion to CEO of the Americas, diminishing her responsibilities as CCO, and creating a discriminatory environment that gave her no choice but to resign. Dkt. 97 at 8–14. YouGov says that Schoenadel suffered nothing more than "an alteration of job responsibilities." Dkt. 76 at 18 (quoting *Joseph*, 465 F.3d at 90); *see, e.g.*, *id.* at 13–14, 20. But under *Muldrow*, there is at least a genuine issue of material fact as to whether the changes pointed to by Schoenadel—including having her responsibilities diminished as CCO and losing out on bonus payments—suffice to sustain a Title VII claim.[3]

---

[3] At oral argument, YouGov suggested that *Muldrow* applies only when evaluating job transfers. Tr. 5:8–6:19. In support, it cited two recent opinions from this district. The first discussed *Muldrow* only in the job-

6

Schoenadel also claims that she was "constructively discharged" when she resigned from YouGov in March 2022. "Though a constructive discharge is a type of adverse employment action, thus far courts have not interpreted *Muldrow* to lessen the standard for showing constructive discharge." *Leon v. Bensalem Twp. Sch. Dist.*, 2024 WL 3744352, at *3 n.3 (E.D. Pa. Aug. 9, 2024); *see also Anderson*, 2024 WL 2801986, at *10 n.1 ("By its terms, Muldrow did not address . . . [the] constructive-discharge theor[y] . . . ."). This may be because "discharge" is listed as a discrete adverse action in the statute. Indeed, the Second Circuit recently addressed a constructive-discharge claim without reference to *Muldrow*. *See Back v. Hapoalim*, 2024 WL 4746263, at *3 (2d Cir. Nov. 12, 2024). Accordingly, the Court relies on existing Second Circuit precedent in addressing Schoenadel's argument that she was constructively discharged.

"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003). "Working conditions are intolerable if they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996). "'Because a reasonable person encounters life's circumstances cumulatively and not individually,' 'a constructive discharge claim can be premised on the cumulative [e]ffect of a number of adverse conditions in the workplace.'" *Back*, 2024 WL 4746263, at *3 (alteration in original) (first quoting *Chertkova*, 92 F.3d at 90; and then quoting *Terry*, 336 F.3d at 153 n.24). "If any relevant facts are in dispute or subject to competing inferences as to their effects, or if there is admissible evidence from which a rational juror could infer that a reasonable employee would have felt [compelled to resign], rejection of the constructive-discharge theory as a matter of law is impermissible." *Green v. Town of East Haven*, 952 F.3d 394, 405 (2d Cir. 2020).

Here, Schoenadel introduced enough evidence to create a genuine issue of material fact as to whether she was constructively discharged. She says that she was singled out for criticism, denied compensation, that responsibilities she was promised as CCO were systematically stripped away, that leadership stopped talking to her or inviting her to meetings, and that she was told the CFO "hated her guts" and wanted to get rid of her. Dkt. 94 ¶¶ 178, 193, 213, 216, 219[4]; *see also* Dkt.

---

transfer context, *see Thompson v. Shutterstock, Inc.*, 2024 WL 2943813, at *7 (S.D.N.Y. June 10, 2024), and the second relied on the pre-*Muldrow* "materially adverse" standard, *Nahar v. ADR Ventures WPR LLC*, 2024 WL 4042433, at *3 (S.D.N.Y. Sept. 3, 2024). Neither case considered the scope of *Muldrow*. YouGov's argument doesn't square with *Muldrow*'s reasoning or the Supreme Court's own statement that the "decision changes the legal standard used in any circuit that has previously required 'significant,' 'material,' or 'serious' injury." *Muldrow*, 601 U.S. at 356 n.2. Accordingly, "the Court holds that *Muldrow* applies to Title VII discrimination cases not involving transfers." *See Mitchell v. Planned Parenthood of Greater N.Y.*, 2024 WL 3849192, at *9 (S.D.N.Y. Aug. 16, 2024).

[4] YouGov moves to strike several sentences of paragraph 178 of Schoenadel's declaration. Dkt. 120 at 13–14. It says that Schoenadel lacks personal knowledge to testify that, "[a]t Martin's in[sistence], Data Product responsibilities were given to [Evan Williams, a man] who had no experience in the area," and that "Martin also repeatedly sought to take Sports client servicing away from [her] and give it to Williams." Dkt. 94 ¶ 178. YouGov also moves to strike on hearsay grounds Schoenadel's statement that "McIntosh . . . told

75-37 at 206. A reasonable juror could find that these actions cumulatively caused Schoenadel's working conditions to be "so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign." *See Green*, 952 F.3d at 405 (citation omitted); *see also Back*, 2024 WL 4746263, at *3 (plaintiff stated a claim for constructive discharge when, among other things, "[s]enior management ceased to interact with [her]" and made comments that "suggested . . . that her job was in danger"). YouGov disputes Schoenadel's characterization of the facts and argues that she was angling to leave long before any of these events occurred, but whether to credit Schoenadel's testimony is a question for the jury.

### B. Pretext

"To satisfy the third-stage burden under *McDonnell Douglas* and survive summary judgment in a Title VII disparate treatment case, a plaintiff may, but need not, show that the employer's stated reason was false, and merely a pretext for discrimination; a plaintiff may also satisfy this burden by producing other evidence indicating that the employer's adverse action was motivated at least in part by the plaintiff's membership in a protected class." *Bart*, 96 F.4th at 576.

YouGov argues that to the extent it took any adverse action against Schoenadel, it was due to poor performance. In response, Schoenadel points to "several types of evidence" from which a jury could infer that YouGov's actions were motivated at least in part by discrimination. Dkt. 97 at 15–21. For example, McIntosh, Chahal, and Sarac (at least two of whom were key members of YouGov's leadership team) privately referred to Schoenadel as "Mama Fratelli," a villain from the film *The Goonies*. Dkt. 125 ¶ 461; Dkt. 75-31 at 175–77.

YouGov says that Schoenadel fails to describe how the nickname supports a discrimination claim. But Schoenadel points to deposition testimony in which McIntosh admitted that the name was based on her appearance, Dkt. 75-31 at 176, and she explains that the movie character "does not conform to conventional notions of femininity or attractiveness." Dkt. 97 at 17. A jury could find that using it to refer to Schoenadel, a gay woman in a male-dominated field, reflects gender bias.[5] Indeed, this conclusion is consistent with the Second Circuit's decision in *King v. Aramark Services, Inc.*, 96 F.4th 546 (2d Cir. 2024), where the court explained that singling out a woman for weight-related remarks and conduct can reflect gender bias, not just a bias against individuals with certain body types. *Id.* at 564. As the Supreme Court has explained, "we are beyond the day

---

Williams that he wanted to take Sports client servicing away from [her]." *Id.* Schoenadel has sufficient personal knowledge to testify that she saw her responsibilities taken away and given to Williams, but the Court disregards Schoenadel's statements that this was done at Martin's insistence or that McIntosh told Williams he wanted to take those responsibilities away.

[5] At oral argument, YouGov argued that the "Mama Fratelli" nickname can't demonstrate gender bias because YouGov leaders also used nicknames for men, such as "Papa Smurf," "Maverdick," "Frankie's Fun Bus," and "Deputy Dog." Tr. 25:13–26:7. The fact that YouGov is apparently a hotbed for derogatory nicknames doesn't move the needle in its favor. A reasonable juror could find that they underscore Schoenadel's allegations of a toxic workplace, and that her nickname was uniquely based on her failure to conform to traditional female stereotypes.

when an employer could evaluate employees by assuming or insisting that they match[] the stereotype associated with their group." *Id.* (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (plurality opinion)).

Schoenadel also points to a "pattern of discrimination" that has led to multiple women in high-level positions leaving the company. Dkt. 97 at 18. YouGov responds that most of those women left voluntarily, and "[f]ive women resigning for new opportunities . . . is hardly sufficient evidence to establish a 'pattern of discrimination.'" Dkt. 137 at 12. But YouGov glosses over evidence that women at YouGov expressed concerns about the company passing them over for promotions and holding them to higher standards than their male counterparts. *See, e.g.*, Dkt. 104 ¶ 19 (Sara Eddleston left YouGov because she felt her efforts weren't recognized and saw no room for advancement); Dkt. 93 ¶ 35 (Jillian Rowen complained to YouGov that she was denied a promotion for opposing sexist conduct). It also insists that a "non-party's opinions . . . cannot preclude summary judgment in favor of YouGov," Dkt. 125 ¶ 516, but this is wishful thinking. *See Zakre v. Norddeutsche Landesbank Girozentrale*, 396 F. Supp. 2d 483, 508 (S.D.N.Y. 2005) (denying summary judgment in part because other women's testimony about employer's "exclusionary culture" could "evidence[] a biased attitude toward women").

Nonetheless, YouGov says that Schoenadel can't prove pretext based on the same-actor inference. The Second Circuit has explained that "[w]hen the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.'" *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) (citing *Grady v. Affiliated Ctr., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)). Because Saez, McIntosh, and Chahal "all participated in various decisions to hire, promote, or increase the compensation of [Schoenadel]," YouGov argues that the same-actor inference bars the conclusion that these individuals took adverse action against Schoenadel based on her gender. Dkt. 76 at 27.

The Second Circuit has yet to determine whether the same-actor inference applies to claims under Title VII. *See Buon v. Spindler*, 65 F.4th 64, 84 (2d Cir. 2023). The Court doubts whether this inference makes sense, either in the Title VII context or outside of it. An individual might hire and promote someone from a protected class, but nevertheless subject them to discrimination along the way—from petty slights and private jokes to more serious forms of differential treatment. All of which might be amplified when the person complains. That doesn't mean evidence of an individual's role in hiring and elevating the plaintiff should be ignored. But it's unclear why it should be elevated above other relevant evidence as a formal "inference," especially when figuring out why an individual acted the way they did will often turn on their credibility—a finding reserved to the jury.

In any event, even if the same-actor inference applies here, it can of course be rebutted. Here, Schoenadel has put in enough evidence to create a genuine issue of material fact on the question of pretext. *See id.* ("[A]t the summary-judgment stage, . . . the potential relevance of the same-actor inference is obvious: at step two of the *McDonnell Douglas* test, defendants are free to present evidence establishing a non-pretextual, non-discriminatory reason for the adverse action

and may invoke the same-actor[]inference, and at step three plaintiffs are afforded an opportunity to rebut that evidence, along with the same-actor inference.").

### III. The State- and City-Law Discrimination Claims Survive

"To establish a gender discrimination claim under the NYCHRL, the plaintiff need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of her gender.'" *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009)). "The NYSHRL standard is 'close[] to the standard of the NYCHRL.'" *Anderson*, 2024 WL 2801986, at *11 (alteration in original) (quoting *Mitura v. Finco Servs., Inc.*, 712 F. Supp. 3d 442, 452 n.4 (S.D.N.Y. 2024)). "[A] plaintiff must show that she was subjected to 'inferior terms, conditions or privileges of employment because of the individual's membership in one or more of the protected categories.'" *Id.* (quoting *Mitura*, 712 F. Supp. 3d at 453).

YouGov doesn't make any unique argument as to these claims, and so they survive for the same reasons as the Title VII claim. *See Anderson*, 2024 WL 2801986, at *11 ("The[] [NYCHRL and NYSHRL] standards are similar to that articulated in *Muldrow*, so the same conclusion follows . . . ."); *see also Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 664 (E.D.N.Y. 2015) ("To the extent that a corporate defendant has failed to show it is entitled to summary judgment under Title VII, it would not be entitled to summary judgment under the more expansive standard of the NYCHRL." (cleaned up)).

### IV. The Title VII Retaliation Claim Survives

Next, YouGov moves for summary judgment on Schoenadel's Title VII retaliation claim. To make out her claim, Schoenadel must show "1) 'participation in a protected activity'; 2) the defendant's knowledge of the protected activity; 3) 'an adverse employment action'; and 4) 'a causal connection between the protected activity and the adverse employment action.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). There is no dispute about prongs one or two here; YouGov's argument rests instead on prongs three and four. It says that Schoenadel has no evidence "that she suffered any adverse action based on her complaint to human resources and Grievance." Dkt. 76 at 28.

#### A. Adverse Employment Action

For the purposes of a retaliation claim, an adverse employment action is any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination."[6] *Vega*,

---

[6] *Muldrow* doesn't alter this standard. There, the Court discussed its decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), which interpreted Title VII's anti-retaliation provision to require retaliatory actions that are "materially adverse." *Muldrow*, 601 U.S. at 357. The Court explained that importing this heightened standard into the discrimination provision would "create a mismatch" because "*White* adopted the standard for reasons peculiar to the retaliation context." *Id.* Namely, "[i]f an action causes less serious harm, . . . it will not deter Title VII enforcement; and if it will not deter Title VII

10

801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). Because "[c]onstructive discharge is considered an adverse employment action sufficient to support a retaliation claim," *Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 194 (E.D.N.Y. 2013), and there's a triable question about whether Schoenadel was constructively discharged, YouGov's argument necessarily fails.

But even setting the constructive-discharge issue aside, YouGov isn't entitled to summary judgment on this prong. Actions that when "considered individually[] might not amount to much" can constitute an adverse employment action if, "[t]aken together" they "paint a mosaic of retaliation." *Vega*, 801 F.3d at 92. After Schoenadel filed her grievance, she says that she was "further isolated and excluded," "not invited to leadership meetings that should have included [her]," "[s]enior leaders would not email or call [her], other than an occasional communication from Saez," and "[w]hen [Schoenadel] requested information, [she] was ignored." Dkt. 94 ¶ 193. Although YouGov cites to cases holding that exclusion from meetings doesn't constitute an adverse action, *see* Dkt. 76 at 29–30, a reasonable juror might find that YouGov's actions, collectively, "could . . . dissuade a reasonable worker from making or supporting a charge of discrimination." *Vega*, 801 F.3d at 90 (quoting *Burlington*, 548 U.S. at 57). After all, "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Burlington*, 548 U.S. at 69 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998)). "A supervisor's refusal to invite an employee to lunch is normally trivial, . . . [b]ut to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id.*

### B. Causal Connection

As for the causal-connection prong, "[u]nlike Title VII discrimination claims, . . . the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Vega*, 801 F.3d at 90. "It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." *Id.* at 90–91. However, "[r]equiring proof that a prohibited consideration was a 'but-for' cause of an adverse action does not equate to a burden to show that such consideration was the 'sole' cause." *Zann Kwan*, 737 F.3d at 846 n.5. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.* at 846.

YouGov says that Schoenadel can't prove a causal connection here because YouGov began excluding her from meetings in July 2021, before she made her first HR complaint. Dkt. 76 at 29–30. But Schoenadel says that her protected activity here actually occurred in three stages. First, on

---

enforcement, it falls outside the purposes of the ban on retaliation." *Id.* This passage makes clear that the *Muldrow* Court didn't intend its holding to apply to retaliation claims under Title VII.

11

July 11, 2021, Schoenadel sent a complaint to Saez and Horowitz that her responsibilities "seem[ed] to be diminishing, assigned to others, placing [her] in a probable position of irrelevance," and that she sensed bias was playing a role. Dkt. 98-126. Saez forwarded this complaint to Chahal. *Id.* Second, on November 11, 2021, Schoenadel emailed Saez and HR a similar complaint. Dkt. 75-1. Finally, on December 23, 2021, Schoenadel filed a grievance with HR formally alleging gender discrimination. Dkt. 75-18.

Because Saez forwarded Schoenadel's July 11, 2021, email to Chahal, Schoenadel says that YouGov leadership was "on notice of protected activity at the time Schoenadel was excluded from meetings in July." Dkt. 97 at 31. YouGov doesn't respond to this argument, nor does it address Schoenadel's argument that her exclusion and isolation worsened after her complaints to HR, other than to question whether Schoenadel can testify about these things, which the Court has already addressed. *See supra* notes 1-2. There is a genuine issue of material fact on the issue of causation.

## V. The State- and City-Law Retaliation Claims Survive

"The NYSHRL makes it unlawful for an employer to retaliate or discriminate against an employee because she 'has opposed any practice forbidden under this article or because . . . she has filed a complaint, testified or assisted in any proceeding under this article.'" *Nezaj v. PS450 Bar & Rest.*, 719 F. Supp. 3d 318, 334 (S.D.N.Y. 2024) (quoting N.Y. Exec. L. § 296(7)). The NYCHRL standard is broader: it requires that the plaintiff "show that something happened that was reasonably likely to deter a person from engaging in protected activity" and "does not require a plaintiff to show but-for causation." *Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 268–69 (S.D.N.Y. 2020) (citation omitted).

Because "[t]he same standards govern retaliation claims under" Title VII and the NYSHRL, *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 330 (S.D.N.Y. 2020), Schoenadel's state-law retaliation claim survives. That holding "dictates the same result under the NYCHRL, whose retaliation standard is similar to—but in part more permissive than—its federal and state analogues." *Id.* at 333.

## VI. The NYLL Wage Claim Survives

Next, YouGov argues that Schoenadel's claim under the NYLL fails as a matter of law because Schoenadel was not a "commission salesman" under the law. In her amended complaint, Schoenadel says that YouGov "failed to pay [her] the full amount of her 2021 to 2022 bonuses and commissions, thereby unlawfully reducing her wages in violation of NYLL § 191(1)(c) and 193(1)." Dkt. 20 ¶ 95. Section 193 makes it unlawful to "make any deduction from the wages of any employee," subject to certain exceptions that are not relevant here. *See* N.Y. Lab. Law § 193(1). Section 191(1)(c) separately defines the required frequency of payments for commission salespeople. And section 190(6) defines "commission salesman" as excluding any "employee whose principal activity is of a supervisory, managerial, executive or administrative nature." Schoenadel concedes that she isn't a commission salesperson under section 191(1)(c). *See* Dkt. 97

at 32. Nevertheless, she argues that she is covered by section 193 and that YouGov unlawfully deducted the sports bonus from her wages.

YouGov first argues that Schoenadel's erroneous citation to section 191(1)(c) torpedoes her section 193 claim. Dkt. 76 at 31. But it cites no authority for this counter-intuitive proposition; if Schoenadel has a claim under section 193, it's not clear why it matters what other statutes she wrongly invoked. Next, YouGov argues in reply that the deduction statute "is not applicable as there can be no impermissible deduction if there was never an entitlement to the compensation." Dkt. 137 at 9. True, a "plaintiff cannot assert a statutory claim for wages under [section 193 of] the Labor Law if he has no enforceable contractual right to those wages." *O'Grady v. BlueCrest Cap. Mgmt. LLP*, 111 F. Supp. 3d 494, 505 (S.D.N.Y. 2015) (citing *Tierney v. Capricorn Invs., L.P.*, 592 N.Y.S.2d 700, 703 (1st Dep't 1993)). But there's a genuine issue of material fact as to whether Schoenadel was contractually entitled to her sports bonus. While YouGov insists that it treats all bonuses as discretionary, Schoenadel introduced a message exchange between Chahal and Sarac about the sports bonus, in which Chahal says that Saez called him and told him that Schoenadel's bonus was contractual, not discretionary.[7] Dkt. 98-85.

### VII. The Court Defers to Trial the Question of Punitive Damages

YouGov has also challenged whether Schoenadel should be permitted to seek punitive damages at trial. "Punitive damages are available under Title VII where an employer discriminates or retaliates against an employee with 'malice' or 'reckless indifference' to the employee's federally protected rights." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 572 (2d Cir. 2011) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999)). The standard is the same under the NYSHRL. *See Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 100 (E.D.N.Y. 2020). "A plaintiff can satisfy this burden by presenting evidence that the employer discriminated (or retaliated) against him with 'conscious knowledge it was violating the law,' or that it engaged in '"egregious" or "outrageous" conduct from which an inference of malice or reckless indifference could be drawn.'" *Tepperwien*, 663 F.3d at 573 (quoting *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 102 (2d Cir. 2011)). "Even where a plaintiff establishes malice or reckless indifference, a corporate defendant may still avail itself of an affirmative defense . . . by showing that it '[1] had an antidiscrimination policy and [2] made a good faith effort to enforce it.'" *Id.* (quoting *Zimmerman v. Assocs. First Cap. Corp.*, 251 F.3d 376, 385 (2d Cir. 2001)). And under the NYCHRL, punitive damages are available if the wrongdoer "has engaged in discrimination with willful or wanton negligence, or recklessness, or a 'conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'" *Chauca v. Abraham*, 89 N.E.3d 475, 481 (N.Y. 2017) (quoting *Home Ins. Co. v. Am. Home Prods. Corp.*,

---

[7] At oral argument, YouGov argued that Schoenadel's NYLL claim fails because the bonus doesn't fall within the statute's definition of "wages." Tr. 13:8–14:17. Because YouGov didn't raise this argument in its summary judgment papers, the Court deems it waived. *See Handschu v. Police Dep't of City of N.Y.*, 905 F. Supp. 2d 555, 561 (S.D.N.Y. 2012) ("A party asserting a claim for the first time during post-briefing oral argument deprives the other party of the opportunity to challenge the merits of the claim in an orderly fashion.").

550 N.E.2d 930, 934 (N.Y. 1990)). "This standard is lower than that required to recover punitive damages under the federal civil rights laws . . . ." *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 325 (S.D.N.Y. 2018).

Whether punitive damages are available here is an inherently factbound question. Because neither side suggests that there is any evidence that is admissible at trial only if punitive damages are in play, the Court will defer to trial—when the parties' evidence will be fully presented—the question of whether Schoenadel has met the standard. YouGov may raise this issue in its Rule 50(a) motion before the close of evidence.

### VIII. The After-Acquired Evidence Defense Will Go to the Jury

Finally, YouGov argues that Schoenadel's claim for damages should be limited based on YouGov's discovery of evidence after her resignation. Under the after-acquired evidence doctrine, "evidence that the employee would have been terminated for lawful reasons will make certain remedies, such as reinstatement and front pay, unavailable." *Greene v. Coach, Inc.*, 218 F. Supp. 2d 404, 412 (S.D.N.Y. 2002). "In order to rely on the after-acquired evidence doctrine, an employer must establish that the wrongdoing was of such severity that the employee would have been terminated on such grounds alone if the employer had known of it at the time of discharge." *Id.* "Summary judgment on this issue 'is inappropriate' where the plaintiff 'raise[s] a material issue of fact as to whether the after-acquired evidence would actually be a basis for termination.'" *Smith v. Tuckahoe Union Free Sch. Dist.*, 2009 WL 3170302, at *12 (S.D.N.Y. Sept. 30, 2009) (alteration in original) (quoting *Greene*, 218 F. Supp. 2d at 413).

YouGov says that it would have terminated Schoenadel based on two pieces of evidence acquired after her separation from the company. First, YouGov says that it discovered that Schoenadel took "multiple YouGov documents containing confidential client information and even took photographs of computer screens containing e-mails where [Schoenadel] was neither the sender not the recipient." Dkt. 76 at 34. YouGov says Schoenadel took the documents while she was negotiating with Playfly, and "[i]f YouGov knew [Schoenadel] was taking photographs of computers and retaining client confidential information to use for improper purposes," it would have terminated her employment. *Id.* (Schoenadel denies that she took screenshots of other employees' computer screens but admits that she took screenshots of her own computer because she believed YouGov was discriminating and retaliating against her. Dkt. 94 ¶ 6.) YouGov also says that it discovered after Schoenadel's resignation that the contract she executed without proper legal review cost the company much more money than it expected. *See* Dkt. 80 ¶¶ 5–6.

To support its argument that Schoenadel would have been fired for valid reasons, YouGov points to an affidavit from Tilly Heald, the Chief Governance and Compliance Officer of YouGov, attesting that YouGov would have terminated Schoenadel for the misconduct it alleges. Dkt. 82 ¶¶ 9, 31. But the Court can't assess Heald's credibility or the weight her testimony should be given at this stage, where the Court views the evidence in the light most favorable to Schoenadel. That's especially true on an issue where YouGov bears the burden of proof. In addition, YouGov hasn't backed Heald's declaration up with any "evidence as to how other [YouGov] employees who

14

made" similar mistakes "were disciplined." *Smith*, 2009 WL 3170302, at *12. YouGov says it doesn't have other senior leaders who made the same mistakes, but even if that's true, it surely has employees who have violated confidentiality agreements or made costly mistakes. "In sum, [YouGov's] evidence supports [its] argument that [Schoenadel's] conduct may 'have been sufficient to support the termination of [her] employment,' but does not establish as a matter of law that [YouGov] 'would have fired [Schoenadel] solely on the basis of'" this conduct, so summary judgment is inappropriate. *See Smith*, 2009 WL 3170302, at *12 (quoting *Greene*, 218 F. Supp. 2d at 413).

## CONCLUSION

For these reasons, YouGov's motions to strike and for summary judgment are DENIED. The Clerk of Court is directed to terminate the motions at Dkts. 66 and 119.

SO ORDERED.

Dated: February 3, 2025
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge